UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION,

UNITED STATES OF AMERICA,

       Plaintiff,

-vs-                              Case No. 17-20183
                                        Hon.  MARK A. GOLDSMITH

D-5, HAROLD LASHAWN NERO,

       Defendant.

_____/

### MOTION FOR THE REVOCATION OF THE
### DETENTION ORDER

     Now comes Defendant, D-5, HAROLD LASHAWN NERO, by and through his

counsel, Mark H. Magidson, and in support of his Motion for the Revocation of the

Detention Order previously entered in this matter, states unto this Honorable Court as

follows:

1.   Defendant is charged with in a multi- count Indictment, with Count I, Sex

      Trafficking Conspiracy, contrary to 18 U.S.C. §1594(c); Count II, sex trafficking

      by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count III, sex

      trafficking by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b);

      Count IV, Conspiracy to Distribute a Controlled Substance, Contrary to 21 U.S.C.

      §§  841(a)(1)l 841(b)(1)(A); 841(b)(1)(C); and Count VIII, Maintaining Drug-

Involved Premises, contrary to 21. U.S.C., §856(a)(1) and or aiding and abetting of the same, contrary to 18 U.S.C. §2.

2. He had been living at the Victory Motel when the Government raided the premises. He was under-employed at the time and was only able to pay for his room and board by doing odd jobs around the hotel such as cleaning up around the outside of the motel or doing similar basic work around the inn.

3. Shortly following the execution of the search warrant, Nero was interviewed by the agents and  thereafter released; he was not arrested for sometime later when agents came to arrest him at a home of a friend where he had been staying.

4. He had not fled the city or avoided detection.

5. Mr. Nero was arrested and thereafter arraigned on these charges on  June 30, 2017.

6. Pleas of not guilty were entered on behalf of Mr. Nero.

7. However, following his arraignment in this matter, Mr. Nero was detained based upon, among other things, the severity of the charges.

8. He is currently in the custody of the U.S. Marshall and is being held in the Midland County Jail.

9. However, in reviewing the Indictment there are no specific allegations that Mr. Nero engaged in any specific acts of violence or engaged in any specific action of drug distribution or specific acts of maintaining a drug premises or engaged in specific acts of sex trafficking.

10. The allegations against Mr. Nero are general in nature and allege in unspecific and vague terms that he "conspired" or "aided and abetted" in the foregoing activities without defining what he actually did.

11. Indeed in going through substantial discovery thus far including written documents and video evidence, Mr. Nero is rarely mentioned directly or by his nickname of "Nephew"; only one mention of Nephew was made by a CI who claimed, " he was at the Victory Motel."

12. He does not have any history of failing to appear for court date(s).

13. It is Defendant's position that the Magistrate Judge erred in finding that there were no conditions or combination of conditions that would satisfy the court that Mr. Nero would not be a danger to the community or that he would not be a flight risk.

14. Through investigation by the defense, various witnesses have been located that know Mr. Nero as well or even better than the agents, who do not know him at all.

15. For instance, Gregory Stocchi  owns and operates a tree service  business, and has known Mr. Nero for many years. He knows him to be a non-aggressive man who is a "gentle giant" because he is large, but not hostile. (See Exhibit A, letter from Mr. Stocchi, attached hereto).

16. This gentleman also has indicated that he would provide his with work or that he could find one of several small companies operated by his friends that could provide Nero with employment.

17. In addition, Mr. Stocchi has indicated in his attached letter that Mr. Nero could stay with him as long as he needs to.

18. James Thompson, Jr. is Mr. Nero's father. He acknowledges not being the best role model having been incarcerated for the first 15 year's of Harold's life. Mr. Thompson notes that he and his son have a good relationship and he knows his son, Harold, to have a good heart and kind to women. In addition, Mr. Thompson is currently disabled and is dependent upon his son to "help me cope." (See Letter attached, exhibit B, letter from James Thompson, Jr.)

19. Kelly Spoor has known Harold Nero for 15-20 years. They are friends, not romantic. She never has observed Mr. Nero being violent nor has she ever heard people refer to him as being violent. She has observed him help people who were desperate. He would help people get clothes and food and he inspired others.

20. Ms. Spoor also commented "Harold would walk with the girls who were too scared to walk alone to the store." In many respects he was a guardian angel to a group of desperate people who lived in a "hellish place." He is not perfect, but there is more good in him than bad. (See Exhibit C, letter from Kelly Spoor, attached hereto).

21. April Romero has known Mr. Nero for seven years. They share a common lifestyle. She has personally never seen him being intimidating or violent. She describes him as being kind and good to other people "like when he feeds and clothes people." She further notes that they talk sports together and respects her. (See Exhibit D, attached hereto)

22. Ms. Romero further notes that she has never heard anyone woman accuse Nero of forcing a woman to do anything nor has she heard of Nero being violent towards women; in "my world, women just don't gossip, they share information about what is really going on…information saves lives." She concludes that if Harold hit just one girl, she would have heard about it.

23. Similarly, Catlynn Durham states that having been on the streets of Southwest Detroit, she got to know Harold Nero, a man she knows as "nephew" or "Sean." She comments that Nero has been a positive influence on her life. She is aware of the claims being made against Mr. Nero and she knows they are false. She concludes that she knows from her own experience that Nero does not force women into drugs or prostitution. (See Exhibit F, attached hereto)

24. Tiffany Wallen is 26 years old and has known Mr. Nero, who she knows as "Sean" or "Nephew" for  two years. She met him at drug house where they were both purchasing narcotics. She was new to the City and was apprehensive. He calmed her down and made sure she was safe. She affirms that Nero never forced any of the girls to take drugs or forced them into prostitution. She normally avoids contact with the "authorities" but is willing to come forward to set the record straight, that Nero is not the man portrayed in the indictment. (See Exhibit G, attached hereto.)

25. Eboni Berry has known Nero for a decade and she describes him as being a hero to the working girls on Michigan Avenue. She calls him "Sean." Just like many of

the girls, he "was addicted, lost souls roaming Michigan Avenue." (See Exhibit H, attached hereto)

26. In the 10 years she has known him, he has never mistreated, harmed or disrespected her or any other woman to her knowledge. If anyone were in need, Nero would "step out of his skin and give it to you." She stayed with him at various times and over the years "he took care of me and a few other girls."

27. She read about the allegation against him in the newspaper and she concludes that the allegations "are totally false." He would walk with the girls up Michigan Avenue to protect them, but he would not harm them. He a loving, caring and spiritual individual who would never exploit females such as herself.

28. The women who have come forward are the workingwomen of Michigan Avenue and are well acquainted with what was occurring at the Victory Inn; they personally confirm that the Government got it wrong with accusing Nero of the chargers against him.

29. The people who know Mr. Nero believe him to be a "gentle giant" and not a man known for hostility and violence. If released on bond he would not pose a danger to the community.

30. Mr. Nero believes there are a combination of conditions that would satisfy this court's concern for the public safety and the concern for appearing for court proceedings.

31. For instance this court can impose a GPS tether to be worn be Nero limiting his travels. Further,  this court could impose a curfew restricting his mobility allowing him only to go to work or medical appointments.

32. Other conditions can be imposed to limit his associations to non-felons and prohibit contact with persons with a prior criminal history.

33. Additionally, because Mr. Nero has a long history of addiction, and participated in drug therapy and rehabilitation at Shar House in Detroit; another condition of bond that the court could impose is regular drug testing and therapy,

34. In short there are conditions that could be imposed that would allow Mr. Nero to be released on bond while awaiting trial.

    WHEREFORE, for the foregoing reasons, Defendant Nero is respectfully requesting that the Order of Detention be set side and an order for personal release, with conditions, if necessary, be imposed allowing Mr. Nero to be free of detention pending trial.

                                        Respectfully submitted,


                                        By /s/Mark H. Magidson
                                        MARK H. MAGIDSON (P25581)
                                        Attorney for Defendant Nero
                                        615 Griswold, Suite 810
                                        Detroit, MI 48226
                                        (313) 963-4311
                                        MMAG100@AOL.COM

<u>**DEFENDANT NERO'S BRIEF IN SUPPORT OF MOTION**</u>
<u>**FOR REVOCATION OF DETENTION ORDER**</u>

**I. FACTUAL STATEMENT**

Defendant is charged with in a multi- count Indictment, with Count I, Sex

Trafficking Conspiracy, contrary to 18 U.S.C. §1594(c); Count II, sex trafficking by

force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count III, sex trafficking

by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count IV, Conspiracy

to Distribute a Controlled Substance, Contrary to 21 U.S.C. §§  841(a)(1)l 841(b)(1)(A);

841(b)(1)(C); and Count VIII, Maintaining Drug-Involved Premises, contrary to 21.

U.S.C., §856(a)(1) and or aiding and abetting of the same, contrary to 18 U.S.C. §2.

He had been living at the Victory Motel when the Government raided the

premises. Years ago when he was released there from prison, he was released to the

Victory Inn. That is where he was paroled to, the premises having been approved by the Michigan Department of Corrections.

Being marginally employed, he could not afford his room, however he was able to pay for his room by doing odd jobs around the motel such as cleaning up around the outside of the premises or doing similar basic work around the area.

He had befriended many of the young women who were "working" at the motel or working up and down Michigan Avenue. He had been a part of the Michigan Avenue scene for many years, known to merchants, hustlers, police and customers. He did use drugs, but contrary to the assertions in the Indictment, he did not foist drugs upon the young women and conspire with others to force them into prostitution to pay off their drug or hotel debts.

He was interviewed by the agents and released following this raid; he was not arrested for sometime later when agents came to arrest him. He had not fled the city or avoided detection. He had been living with a friend on the Westside. He does have a prior criminal record, but no history of failure to appear.

Mr. Nero was arraigned on these charges on June 30, 2017. Pleas of not guilty were entered on behalf of Mr. Nero. However, following his arraignment in this matter, Mr. Nero was detained based upon, among other things, the severity of the charges. He is currently in the custody of the U.S. Marshall and is being held in the Midland County Jail.

In reviewing the Indictment, there are no specific allegations that Mr. Nero engaged in any specific acts of violence or engaged in any specific action of drug distribution or

specific acts of maintaining a drug premises or engaged in specific acts of sex trafficking. While he does have a prior criminal record, he was not on probation or parole at the time of these alleged offenses. He believes that he is being detained in this case because of his past record, and not what he did in this case.

The discovery provided to date give few clues as to what if anything Mr. Nero did to participate in the charged conspiracies or what he did to aid and abet other Defendants. Mr. Nero's long history of addiction put him in similar circumstances of many of the women in this case who were (are) addicted to narcotics. However, in Mr. Nero's case, when he can get treatment, he can hold and maintain employment and is reliable.

Gregory Stocchi is his former employer. He has a tree service. He has hired Mr. Nero in the past and is willing to hire him again. He knows Mr. Nero to be non-aggressive and gentle, completely the opposite of what the Government has portrayed him in the Indictment. In fact, Mr. Stocchi is willing to have Mr. Nero live with him during the pendency of this case and provide him employment, either in his company or in another company owned by colleagues.

James Thompson, Jr. is Mr. Nero's father. He acknowledges not being the best role model having been incarcerated for the first 15 year's of Harold's life. Mr. Thompson notes that he and his son have a good relationship and he knows his son, Harold, to have a good heart and kind to women. In addition, Mr. Thompson is currently disabled and is dependent upon his son to "help me cope." Kelly Spooner has known Harold Nero for 15-20 years. They are friends, not romantic. She never has observed Mr. Nero being violent nor has she ever heard people refer to him as being violent. She has observed him

help people who were desperate. He would help people get clothes and food and he inspired others.

Ms. Spoor is a woman familiar with the Michigan Avenue lifestyle. She also commented "Harold would walk with the girls who were too scared to walk alone to the store." In many respects he was a guardian angel to a group of desperate people who lived in a "hellish place." He is not perfect, but there is more good in him than bad.

The other working girls of Michigan Avenue know Nero to be a generous and gentle person. They are companions both in their common addiction to drugs, and in the lifestyle known as Michigan Avenue. Possession and using drugs may be a crime, but it is not the type of crime that justifies pre-trial detainment, especially since there are alternatives. The people who know Mr. Nero believe him to be a "gentle giant" and not a man known for hostility and violence. If released on bond he would not pose a danger to the community

## II. ARGUMENT

### THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT THERE WERE NO CONDITIONS OR CIRCUMSTANCES THAT WOULD PROTECT SOCIETY AND ASSURE THE DEFENDANT'S APPEARANCE.

According to the provisions of 18 U.S.C. § 3142(e), a defendant shall be detained pending trial if, after a hearing, the judicial officer finds that no condition or set of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. Section 3142(g) sets out the factors to be considered in making that determination. Those factors are: (1) the nature and

circumstances of the offense charged; (2) the weight of the evidence against the person;
(3) the history and characteristics of the person; and (4) the nature and seriousness of the
danger to any person or the community that would be posed by the defendant's release.

"The law requires reasonable assurance but does not demand absolute certainty."
*United States v. Alston,* 420 F.2d 176, 178 (D.C.Cir.1969); *see also United States v. Orta,*
760 F. 2d 887, 891–92 (8th Cir.1985):

the district court erred in interpreting the "reasonably assure" standard set forth in the
statute as a requirement that release conditions "guarantee" community safety and the
defendant's appearance. Such an interpretation contradicts both the framework and the
intent of the pretrial release and detention provision of the 1984 Act. Congress envisioned
the pretrial detention of only a fraction of accused individuals awaiting trial. The district
court's interpretation, however, virtually mandates the detention of almost every pretrial
defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns.

The structure of the [bail] statute mandates every form of release be considered before
detention may be imposed. That structure cannot be altered by building a "guarantee"
requirement atop the legal criterion erected to evaluate release conditions in individual
cases. *United States v. Orta,* 760 F.2d 887, 892 (8th Cir.1985).

The Court reviews a defendant's appeal of an order of detention *de novo. U.S. v. Leon,*
766 F.2d 77 (2d Cir.1985); *see also U.S. v. Koubriti,* 2001 WL 1525270 (E.D.Mich.2001)

(Although the Sixth Circuit has not squarely addressed the issue of the proper standard of review of a Magistrate Judge's detention order, the majority of the circuits that have considered the issue have ruled that a *de novo* review is appropriate); *U.S. v. Runnderstand,* 2008 WL 927774 (E.D.Mich.2008). In reviewing the appeal, the Court "may 'start from scratch' and hold a new hearing or review the transcripts of the proceedings before the magistrate." *United States v. Hammond,* 204 F.Supp.2d 1157, 1162 (E.D.Wis.2002) (citing *United States v. Torres,* 929 F.2d 291, 292 (7th Cir.1991)); *see also United States v. Vasquez,* 241 F.Supp.2d 34, 35 (D.Me.2003) (court considered both the transcript of the hearing before the Magistrate Judge and additional evidence produced at a hearing).

The Defendants' guilt or innocence need not be decided at a detention hearing. Indeed, "the statute neither requires nor permits a pretrial determination of guilt." *See United States v. Johnson,* 2007 WL 1712541 at *1 (E.D.Mich. June 13, 2007) (citing *United States v. Gebro,* 948 F.2d 1118, 1121 (9th Cir.1991)). Nonetheless, the weight of the evidence the Government has against Defendants is an important consideration. In fact, the seriousness of the charged offenses, the weight of the evidence, and whether the Defendants are a danger to the community, are inextricably intertwined.

While 18 U.S.C. 3142(e)(3) creates a rebuttal presumption in favor of detention in this case, the presumption requires merely that Mr. Nero "come forward with evidence that he does not pose a danger to the community or risk of flight" and that burden of production

in rebuttal requires Mr. Nero to present some evidence in his favor while the burden of persuasion continues to rest with the Government. *United States v. Mercedes*, 254 F. 3d 433, 436 (2nd Cir., 2001); *United States v. Strickland*, 932 F.2d 1353, 1355 (10th Cir. 1991).

The Sixth Circuit has held that in both presumption and non-presumption cases, the Government maintains the burden of proving that no condition of release can assure the defendant will appear nor that they can assure the safety of the community. *United States v Stone*, 608 F.3d 939,946 (2010). Further the Court in *Stone* emphasized that in cases "involving multiple defendants who are not similarly situated, the dangerousness inquiry must be an individualized one. Just as at trial, in which courts and juries must resist the urge to find guilt or innocence by association, each defendant is entitled to have an individualized determination of bail eligibility, *Id.*

The required individualized assessment must be viewed in the context of a Defendant's strong Fifth Amendment liberty interest such that there are limited circumstances in which the Government's interest in detention for purposes of community safety or to guarantee appearance are limited. *United States v. Salerno*, 481 U.S. 739,749-50, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). There the Court held that that it was not a deprivation of Due Process to deny bail to the leader and captain of a Mafia crime family who were accused of 35 racketeering acts and many continuous violent acts.

Here, as noted in the Motion, the allegations in the Indictment are sparse and vague.

The Indictment outlines serious allegations against other members of this conspiracy, but there is nothing specific as to Mr. There are no specific allegations as to Mr. Nero, only vague conclusions. The history of Mr. Nero is that has problem with addiction.  He has a history of people taking advantage of him when he used drugs. But the people who know him, attest to the fact that he is not abusive and in fact can be a "guardian angel" to those who are in distress

   WHEREFORE, Mr. Nero respectfully request that this Court review this matter, and permit Defendant to call witnesses, particularly Mr. Stocchi and others who can attest that they can provide Nero with a job and accommodations and attest to what was really going on at the Inn as it relates to Nero, and after due consideration, release Mr. Nero on an unsecured bond with any conditions this court deems reasonable and necessary.

                              Respectfully submitted,


                              By */s/Mark H. Magidson*
                                    MARK H. MAGIDSON (P25581)
                                    Attorney for Defendant Nero
                                    615 Griswold, Suite 810
                                    Detroit, MI 48226
                                    (313) 963-4311
                                    MMAG100@AOL.COM

**CERTIFICATE OF SERVICE**

I certify that on December 19, 2017 I electronically filed the above  MOTION

FOR THE REVOCATION OF THE DETENTION ORDER with the Clerk of the Court

using the ECF system, which will send notification of such filing to the parties of record.


By: s/Mark H. Magidson
MARK H. MAGIDSON (P25581)
Attorney for Harold Nero
615 Griswold, Ste. 810
Detroit, MI 48226
(313) 963-4311