UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION,

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-                                               Case No. 17-20183
                                                    Hon. MARK A. GOLDSMITH

D-5, HAROLD LASHAWN NERO,

    Defendant.

_____/

## REVISED MOTION FOR THE REVOCATION OF THE DETENTION ORDER

    Now comes Defendant, D-5, HAROLD LASHAWN NERO, by and through his counsel, Mark H. Magidson, and in support of his Revised Motion for the Revocation of the Detention Order previously filed in this matter, states unto this Honorable Court as follows:

1. Defendant is charged with in a multi- count Indictment, with Count I, Sex Trafficking Conspiracy, contrary to 18 U.S.C. §1594(c); Count II, sex trafficking by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count III, sex trafficking by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count IV, Conspiracy to Distribute a Controlled Substance, Contrary to 21 U.S.C. §§ 841(a)(1)l 841(b)(1)(A); 841(b)(1)(C); and Count VIII, Maintaining Drug-

    Involved Premises, contrary to 21. U.S.C., §856(a)(1) and or aiding and abetting of the same, contrary to 18 U.S.C. §2.

2. He had been a frequent visitor at the Victory Motel when the Government raided the premises. He was under-employed at the time, a small time hustler.[1]

3. When he was paroled in March of 2016 he gave the Victory Inn as his address and he was paroled to that facility. At the time the only way he was able to pay for his room was by doing odd jobs around the hotel such as cleaning up around the outside of the motel or doing similar basic work around the inn.

4. The Victory Inn at the time of the raid was home to drug addicts and prostitutes; drugs were sold by a variety of people. This was a den of debauchery, licentiousness and self-indulgence.

5. The Victory Inn was a life-style for a genre of people who were alienated from the mainstream or even the sidestream; they were in their own eddies and currents, directed only by their desire to get drugs and get high. For many of the persons connected to the Victory, their drug of choice was heroin; for Mr. Nero his drug was crack cocaine that he smoked.

6. For many of the women connected with the Inn, their main source of income was prostitution. They would bring their customers to the Inn and rent a room; sometimes they had the room already rented and the men would come to their

---

[1] someone who knows how to get money from others. selling drugs,rolling dice,.. your hustlin for that money. https://www.urbandictionary.com/define.php?term=hustler
  "I'm a **Hustla** I can sell Salt To a Slug", verse by Cassidy

room. The women who Mr. Nero knew would get customers from online sources such as Backpage.com or they walked Michigan Avenue.

7. Shortly following the execution of the search warrant, Nero was interviewed by the agents and thereafter released; he was not arrested for sometime later when agents came to arrest him at a home of a friend where he had been staying.

8. He had not fled the city or avoided detection.

9. Mr. Nero was arrested and thereafter arraigned on these charges on June 30, 2017.

10. However, following his arraignment in this matter, Mr. Nero was detained based upon, among other things, the severity of the charges and his criminal history.

11. He is currently in the custody of the U.S. Marshall and is being held in the Sanilac County Jail; before that it was the Midland County Jail.

12. Mr. Nero has been locked up in county jails for two years; these detention facilities are built and designed to hold inmates no longer that one year. Most persons in the county jails are either awaiting trials in state court which will occur in less than one year or they have been sentenced to "county" time, the maximum can only be one year.

13. There are no educational or other long-term programs at county jails because inmates there are not expected to be there for any length of time.

14. Further, this county jail, like many others in Michigan is not equipped to have contact visitation. The only contact Mr. Nero can have with family or friends is

via a recording or video. The effects on prolonged pretrial detention can be profound and unfair and are the subject of many articles. [2]

15. Mr. Nero has now been detained for two years; he has no major behavior problems according to the deputies at the Sanilac County Jail.[3]

16. In reviewing the Indictment there are no specific allegations that Mr. Nero engaged in any specific acts of violence or engaged in any specific action of drug distribution or specific acts of maintaining a drug premises or engaged in specific acts of sex trafficking.

17. The allegations against Mr. Nero are general in nature and allege in unspecific and vague terms that he "conspired" or "aided and abetted" in the foregoing activities without defining what he actually did.

18. Indeed in going through substantial discovery thus far including written documents and video evidence, Mr. Nero is rarely mentioned directly or by his

---

[2] Many people who have spent time in detention may eventually be acquitted or released without a trial. Others may be convicted of low-level crimes that do not carry a prison sentence or receive sentences for terms of imprisonment less than the period they spent in detention.

In the U.S., which has the largest pretrial detention population in the world, 20 percent of detainees eventually had their case dismissed or were acquitted.[9] After the long wait for a trial in Argentina, 30 percent of detainees were acquitted.[10] In Mexico, 14 percent of detainees were acquitted; of those who were convicted, 85 percent received sentences of less than five years, meaning that their detention exceeded the sentence.[11] **Prisons: In Jail, But Not Sentenced | Americas Quarterly**
https://www.americasquarterly.org/aborn-prisons

[3] When asked for reports, the Sanilac County Jail officer stated that the reports are sent to the Marshall's office and cannot be released to defense counsel.

nickname of "Nephew"; only one mention of Nephew was made by a CI who claimed, " he was at the Victory Motel."

19. It is Defendant's position that the Magistrate Judge erred in finding that there were no conditions or combination of conditions that would satisfy the court that Mr. Nero would not be a danger to the community or that he would not be a flight risk.

20. It is further his position that facts have changed since the court's last consideration of this issue to justify this court taking a "second look" at the order forof pretrial detention. Specifically, Mr. Nero has been locked up for two years in a county jail designed to house inmates for a maximum of one year; he has had no significant behavior problems. Second, the defense has uncovered more witnesses to vouch on behalf of Mr. Nero and discredit the theories of the prosecution.

21. At the time of the previous motion, investigation by the defense, various witnesses were located that know Mr. Nero as well or even better than the agents, who do not know him at all.

PAST INVESTIGATIONS

22. For instance, previous  a letter from Gregory Stocchi who owns and operates a tree service  business, and has known Mr. Nero for many years was willing and is still will to employ Nero. His letter was attached to the last motion and the facts have not changed specifically that he knows Nero to be a non-aggressive man who is a "gentle giant" and that he was a job waiting for Nero.

5

23. This gentleman also has indicated that he would provide Nero with work or that he could find one of several small companies operated by his friends that could provide Nero with employment. This promise remains.

24. In addition, Mr. Stocchi indicated at the time of the last motion that Mr. Nero could stay with him as long as he needs to; nothing has changed.

25. Further, James Thompson, Jr. who is Mr. Nero's father wrote a letter supporting his son. He acknowledged not being the best role model having been incarcerated for the first 15 year's of Harold's life. However ,Mr. Thompson noted that he and his son have now have good relationship and he knows his son, Harold, to have a good heart and is to all persons, including women. In addition, Mr. Thompson is still disabled as he was when he wrote his previous letter and relied upon his son to deal with the day to day issues of being physically limited.

26. Kelly Spoor also wrote a letter which was attached to the prior motion She has known Harold Nero for 15-20 years. They are friends, not romantic. She never has observed Mr. Nero being violent nor has she ever heard people refer to him as being violent. She has observed him help people who were desperate. He would help people get clothes and food and he inspired others. He opinions have not changed.

27. In her last letter, Ms. Spoor commented "Harold would walk with the girls who were too scared to walk alone to the store." In many respects he was a guardian angel to a group of desperate people who lived in a "hellish place." He is not perfect, she observed, but there is more good in him than bad.

28. April Romero has known Mr. Nero for seven years. They share a common lifestyle. She has personally never seen him being intimidating or violent. She describes him as being kind and good to other people "like when he feeds and clothes people." She further notes that they talk sports together and respects her.

29. Ms. Romero further noted that she has never heard anyone woman accuse Nero of forcing a woman to do anything nor has she heard of Nero being violent towards women; in "my world, women just don't gossip, they share information about what is really going on…information saves lives." She concludes that if Harold hit just one girl, she would have heard about it.

30. Similarly, Catlynn Durham stated that having been on the streets of Southwest Detroit, she got to know Harold Nero, a man she knows as "nephew" or "Sean." She commented that Nero has been a positive influence on her life. She was aware of the claims being made against Mr. Nero and she knows they are false. She concludes that she knows from her own experience that Nero does not force women into drugs or prostitution.

31. Further Tiffany Wallen was 26 years old when she wrote a letter on behalf of Mr. Nero. She stated she knew. Nero, who she knows as "Sean" or "Nephew" for two years. She met him at drug house where they were both purchasing narcotics. She was new to the City and was apprehensive. He calmed her down and made sure she was safe. She affirmed that Nero never forced any of the girls to take drugs or forced them into prostitution. She normally avoids contact with the "authorities"

but is willing to come forward to set the record straight, that Nero is not the man portrayed in the indictment.

32. At the time of the prior motion, Eboni Berry had known Nero for a decade and she described him as being a "hero to the working girls on Michigan Avenue". She calls him "Sean." Just like many of the girls, he "was addicted, lost souls roaming Michigan Avenue." Her feelings and opinions have not changed.

33. In the 10 years she Ms. Berri has known him, he has never mistreated, harmed or disrespected her or any other woman to her knowledge. If anyone were in need, Nero would "step out of his skin and give it to you." She stayed with him at various times and over the years "he took care of me and a few other girls."

34. Ms. Berri read about the allegation against him in the newspaper and she concluded that the allegations, as described in the media "are totally false." He would walk with the girls up Michigan Avenue to protect them, but he would not harm them. He was a loving, caring and spiritual individual who would never exploit females such as herself.

35. These women who previously came forward are the workingwomen of Michigan Avenue and are well acquainted with what was occurring at the Victory Inn; they personally confirm that the Government got it wrong with accusing Nero of the chargers against him.

36. The people who know Mr. Nero believe him to be a "gentle giant" and not a man known for hostility and violence. If released on bond he would not pose a danger to the community.

**MORE RECENT INVESTIGATIONS**

37. Since the filing of the last motion, Defendant's counsel and investigator have located persons who were in the suspicious activities portions of the Victory Inn videos. The Government contends that these action videos support the sex trafficking and drug distribution charges contained in the Indictment. However theses witnesses confirm just the opposite and support Nero's position

38. For example, in one video, Nero is seen carrying a woman (identified here as "C") out of an Inn room. She has her arms around Nero's neck and legs crossed around his waist. She is not fully awake. The government argues that this was an example of Nero engaged in an act in furtherance of the sex trafficking conspiracy/drug distribution. When asked about that scene, Nero explained that he had room at the Inn with C, his girlfriend at the time. C had been in an Inn room occupied by man, "D," to get high because D usually had a supply of heroin. After an hour or two, D called Nero to come and get C because she had fallen asleep in his room. Nero states that he went to D's room and carried C back to their room. That is an innocent explanation for Nero's behavior on the video.

39. Individual C was located after multiple efforts. She was asked about the incident recorded by the security video, and she agreed with Nero's explanation. C and Nero were together, and she was staying with him. C had gotten high and fell asleep, and Nero came to get her. Her memory is not specific as to dates, but C was specific about the details of the incident. C and Nero were intimate (not exclusive), they got high together, he treated her very well, and Nero was

9

someone C could trust and rely upon. Nero never forced her (or any woman) to do anything against their will. C completely supported Nero's explanation of the facts.

40. In another video recorded incident, Nero is seen slapping a woman. She is hit in the face, and she falls to a knee. This takes place in a hallway of the Victory Inn. The government contends this was another example of Nero engaged in an act in furtherance of the sex trafficking conspiracy and or conspiracy to distribute drugs.

41. When asked about this clip, Nero explained that the woman was "Little B," whom he had known for years and considered to be like a niece. Nero acknowledges slapping her but not to force her to perform sexual acts or to pay a drug debt. Nero had gone into D's room to get high when he saw D wearing one of Nero's own shirts. Nero asked where D got the shirt, and D stated that he bought it from Little B without knowing it belonged to Nero.

42. Nero confronted Little B, and she admitted to having stolen his property. The video shows Nero slapping Little B and his position it was for "punishment" for the theft. That was "street justice," according to Nero. He was not going to go to the police, he was going to mete out punishment then and there, and that was the end of the dispute. The assault had nothing to do with sex trafficking or drug distribution; it was punishment for the theft of his property, according to him.

43. After great searching and many missed appointments, Little B was located by the defense. Little B is a heroin addict and engages in prostitution. She claims to have a boyfriend who protects her on the street. When asked about the "slap" in the

video, Little B recalled an incident when she stole Nero's property and he slapped or hit her as a result. She was sorry for stealing but needed to get high. She confirms that Nero has always protected her (and the other women) and has never forced her, or anyone to have sex or use drugs. Little B cares for Nero and hopes she can be available for trial, but she does not know where she will be in the following months. She confirmed Nero's version of the event.

44. Mr. Nero believes there are a combination of conditions that would satisfy this court's concern for the public safety and the concern for appearing for court proceedings.

45. For instance this court can impose a GPS tether to be worn be Nero limiting his travels. Further, this court could impose a curfew restricting his mobility allowing him only to go to work or medical appointments.

46. Other conditions can be imposed to limit his associations to non-felons and prohibit contact with persons with a prior criminal history.

47. Additionally, because Mr. Nero has a long history of addiction, and participated in drug therapy and rehabilitation at Shar House in Detroit; another condition of bond that the court could impose is regular drug testing and therapy,

48. In short there are conditions that could be imposed that would allow Mr. Nero to be released on bond while awaiting trial.

      WHEREFORE, for the foregoing reasons, Defendant Nero is respectfully requesting that the Order of Detention be set side and an order for personal

release, with conditions, if necessary, be imposed allowing Mr. Nero to be free of detention pending trial.

Respectfully submitted,

By: */s/Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant Nero
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311
MMAG100@AOL.COM

## DEFENDANT NERO'S BRIEF IN SUPPORT OF MOTION FOR REVOCATION OF DETENTION ORDER

**I. FACTUAL STATEMENT**

Defendant is charged with in a multi- count Indictment, with Count I, Sex Trafficking Conspiracy, contrary to 18 U.S.C. §1594(c); Count II, sex trafficking by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count III, sex trafficking by force, fraud and coercion, contrary to 18 U.S.C. §1591(a)&(b); Count IV, Conspiracy to Distribute a Controlled Substance, Contrary to 21 U.S.C. §§ 841(a)(1)l 841(b)(1)(A); 841(b)(1)(C); and Count VIII, Maintaining Drug-Involved Premises, contrary to 21. U.S.C., §856(a)(1) and or aiding and abetting of the same, contrary to 18 U.S.C. §2.

Mr. Nero previously filed a Motion for the revocation of the Detention Order, approximately a year ago that was denied by this Court. However, Mr. Nero believes

there are new considerations, which this Court should consider that could lead to a different result. Specifically he has been detained two years at facilities that are only designed to maximally detain someone for one year and do not allow for contact visitation, yet he has had no major misconducts or misbehaviors. Second, the defense has located other witnesses who can vouch that the suspect behavior seen in the videos is conduct that would not in fact support the allegations contained in the Indictment and in fact support Nero's position. His position is that he was merely present in this web of drugs and prostitution and hustling and that he was also an addict living the same lifestyle of the women who are alleged to be his victims.

## II. ARGUMENT

### THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT THERE WERE NO CONDITIONS OR CIRCUMSTANCES THAT WOULD PROTECT SOCIETY AND ASSURE THE DEFERNDANT'S APPEARANCE.

According to the provisions of 18 U.S.C. § 3142(e), a defendant shall be detained pending trial if, after a hearing, the judicial officer finds that no condition or set of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. Section 3142(g) sets out the factors to be considered in making that determination. Those factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

"The law requires reasonable assurance but does not demand absolute certainty." *United States v. Alston,* 420 F.2d 176, 178 (D.C.Cir.1969); *see also United States v. Orta,* 760 F. 2d 887, 891–92 (8th Cir.1985):

the district court erred in interpreting the "reasonably assure" standard set forth in the statute as a requirement that release conditions "guarantee" community safety and the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act. Congress envisioned the pretrial detention of only a fraction of accused

13

>individuals awaiting trial. The district court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns.
>
>The structure of the [bail] statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a "guarantee" requirement atop the legal criterion erected to evaluate release conditions in individual cases. *United States v. Orta, Supra, at 892*

The Court reviews a defendant's appeal of an order of detention *de novo. U.S. v. Leon,* 766 F.2d 77 (2d Cir.1985); *see also U.S. v. Koubriti,* 2001 WL 1525270 (E.D.Mich.2001) (Although the Sixth Circuit has not squarely addressed the issue of the proper standard of review of a Magistrate Judge's detention order, the majority of the circuits that have considered the issue have ruled that a *de novo* review is appropriate); *U.S. v. Runnderstand,* 2008 WL 927774 (E.D.Mich.2008). In reviewing the appeal, the Court "may 'start from scratch' and hold a new hearing or review the transcripts of the proceedings before the magistrate." *United States v. Hammond,* 204 F.Supp.2d 1157, 1162 (E.D.Wis.2002) (citing *United States v. Torres,* 929 F.2d 291, 292 (7th Cir.1991)); *see also United States v. Vasquez,* 241 F.Supp.2d 34, 35 (D.Me.2003) (court considered both the transcript of the hearing before the Magistrate Judge and additional evidence produced at a hearing).

The Defendants' guilt or innocence need not be decided at a detention hearing. Indeed, "the statute neither requires nor permits a pretrial determination of guilt." *See United States v. Johnson,* 2007 WL 1712541 at *1 (E.D.Mich. June 13, 2007) (citing *United States v. Gebro,* 948 F.2d 1118, 1121 (9th Cir.1991)). Nonetheless, the weight of the evidence the Government has against Defendants is an important consideration. In fact, the seriousness of the charged offenses, the weight of the evidence, and whether the Defendants are a danger to the community, are inextricably intertwined.

While 18 U.S.C. 3142(e)(3) creates a rebuttal presumption in favor of detention in this case, the presumption requires merely that Mr. Nero "come forward with evidence that he does not pose a danger to the community or risk of flight" and that burden of production in rebuttal requires Mr. Nero to present some evidence in his favor while the burden of persuasion continues to rest with the Government. *United States v. Mercedes*, 254 F. 3d 433, 436 (2nd Cir., 2001); *United States v. Strickland*, 932 F.2d 1353, 1355 (10th Cir. 1991).

The Sixth Circuit has held that in both presumption and non-presumption cases, the Government maintains the burden of proving that no condition of release can assure the defendant will appear nor that they can assure the safety of the community. *United States v Stone*, 608 F.3d 939,946 (2010). Further the Court in *Stone* emphasized that in cases "involving multiple defendants who are not similarly situated, the dangerousness inquiry must be an individualized one. Just as at trial, in which courts and juries must resist the urge to find guilt or innocence by association, each defendant is entitled to have an individualized determination of bail eligibility, *Id.*

The required individualized assessment must be viewed in the context of a Defendant's strong Fifth Amendment liberty interest such that there are limited circumstances in which the Government's interest in detention for purposes of community safety or to guarantee appearance are limited. *United States v. Salerno*, 481 U.S. 739,749-50, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). There the Court held that that it was not a deprivation of Due Process to deny bail to the leader and captain of a Mafia crime family who were accused of 35 racketeering acts and many continuous violent acts.

Here, as noted in the Motion, the allegations in the Indictment are sparse and vague. The Indictment outlines serious allegations against other members of this conspiracy, but there is nothing specific as to Mr. There are no specific allegations as to Mr. Nero, only vague conclusions. The history of Mr. Nero is that has problem with addiction.  He has a history of people taking advantage of him when he used drugs. But the people who know him, attest to the fact that he is not abusive and in fact can be a "guardian angel" to those who are in distress and the people depicted in the videos as his "victims" state facts to the contrary.

WHEREFORE, Mr. Nero respectfully request that this Court review this matter, and

15

permit Defendant to call witnesses, who can attest that they can provide Nero with a job and accommodations and attest to what was really going on at the Inn as it relates to Nero, and after due consideration, release Mr. Nero on an unsecured bond with any conditions this court deems reasonable and necessary.

Respectfully submitted,

By: */s/Mark H. Magidson*
      MARK H. MAGIDSON (P25581)
      Attorney for Defendant Nero
      615 Griswold, Suite 810
      Detroit, MI 48226
      (313) 963-4311
      MMAG100@AOL.COM