UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

*vs*.

                                Case No. 17-20183
                                HON.  MARK A. GOLDSMITH

HAROLD LASHAWN NERO (D-5),

      Defendant.

_____

## DEFENDANT NERO'S THIRD MOTION
## TO REVOKE THE DETENTION ORDER

      Defendant Harold Nero, represented by attorney Mark Magidson, moves this Honorable Court to revoke the detention order now that the government has filed another Motion for a continuance of the trial (Doc. 512)(Nero has filed a contemporaneous Response objecting to the government's motion). This Court denied Nero's prior motions to revoke the detention order, (Order, Doc. 183; and Order, Doc 303); however, Nero now argues that his continued detention violates his right to due process, and that compelling circumstances support his temporary release under 18 U.S.C. § 3142(i)(4).

Dated: October 5, 2020

Respectfully submitted,

By: /s/*Mark H. Magidson*
    MARK H. MAGIDSON (P25581)
    Attorney for Defendant Nero
    1 Park Ave, Suite 1207
    Detroit, MI 48226
    (313) 963-4311
    mmag100@aol.com

## Certificate Regarding Concurrence

I certify and affirm, in compliance with E.D. Mich. LR 7.1(a)(2)(A), that I explained the nature of this motion and its legal basis and requested but did not obtain concurrence in the relief sought.

By: /s/*Mark H. Magidson*
    MARK H. MAGIDSON (P25581)
    Attorney for Defendant Nero

## BRIEF IN SUPPORT OF
## DEFENDANT NERO'S THIRD MOTION
## TO REVOKE THE DETENTION ORDER

## FACTS

Defendant is charged in a multi-count, Superseding Indictment (Doc. 98), with Count 1, Sex Trafficking Conspiracy, contrary to 18 U.S.C. § 1594(c); Counts 3–8, sex trafficking by force, fraud and coercion, contrary to 18 U.S.C. § 1591(a)–(b), and or aiding and abetting of the same, contrary to 18 U.S.C. § 2; Count 11, Conspiracy to Distribute a Controlled Substance, contrary to 21 U.S.C. §§ 841(a)(1); 841(b)(1)(A); 841(b)(1)(C); and Count 18, Maintaining Drug-Involved Premises, contrary to 21 U.S.C. § 856(a)(1); and or aiding and abetting of the same, contrary to 18 U.S.C. § 2.

Defendant Nero has been in custody since June 30, 2017, and he was arraigned on the superseding indictment on September 28, 2017.

Before Nero was in custody, the government and co-defendants had stipulated to a finding that this was a "mega" case. Nero has never stipulated that this is a mega case.

Nero agreed to two continuances excluding the time from his arraignment to May 23, 2018. (Stip. Order, Doc. 171, Pg ID 482-483). Nero agreed to those continuances despite the fact that the government chose to indict him before it had

sufficiently reviewed the evidence it had collected. Nero has objected to the additional continuances requested by the government.

Nero has been in custody for three years and three months since his arrest, and he has been held in a limited, short term facility, a county jail that is only designed to house offenders for a maximum of one year. He will have been in custody for three years and 10 months by the time of the proposed May 24, 2020 trial date.

Additionally, Nero's physical condition puts him at risk during the COVID-19 pandemic. He has a mildly enlarged aorta with a small pericardial effusion discovered after radiology treatment while in custody. (Exhibit A - Medical Record, 6/11/19). Nero has chest pain, hypertension, and his echocardiogram showed "severe asymmetric septal hypertrophy" with the septal and posterior wall measurements indicating "suspicious for hypertrophic cardiomyopathy." (Ex. B - Med. Rec., 6-17-19).

In August 2020, Nero had constipation, abdominal bloating, an umbilical hernia, hiatal hernia, intermittent vomiting, and was sent to a general surgeon for evaluation. (Ex. C - Med. Rec., 8/18/20).

Nero has been prescribed 19 medications. (Ex. D - Medication Chart). He is still taking 16 of those medications, only recently discontinuing three. *Id*.

Nero has a Body Mass Index of 39.73, weighing 356 pounds, and 76 inches tall, as of August 18, 2020. (Ex. E - Vital Signs). The Centers for Disease Control states that "having obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19," and it is one of the conditions that increase the risk of severe COVID-19 illness.[1]

Nero had also been diagnosed with Rhabdomyolysis back in December 2018. (Ex. F - Discharge Diagnosis 12/23/18). Rhabdomyolysis can be a life-threatening condition caused by muscle breakdown, muscle death, severe kidney damage, and death. (Ex. G - Cleveland Clinic Article).

## ARGUMENT

This Court may reopen a hearing if it: (1) finds that information exists that was not known to the defendant at the time of the original hearing; and (2) the information "has a material bearing on the issue whether there are conditions of release that will reasonably assure" the defendant's appearance and the safety of the community. 18 U.S.C. § 3142(f)(2).

---

[1] Centers for Disease Control website:  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity

I.      **Due process**.

The U.S. Supreme Court has stated that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (footnote omitted). "[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.*

"There is no particular point at which a valid pretrial detention becomes unconstitutionally excessive; rather, the determination depends on the individual circumstances." *U.S. v. Nagi*, Case No. 09-1995, Doc. 22-1, Pg ID 3 (6th Cir. 2009)(see attached order Exhibit H).

The Sixth Circuit court of Appeals adopted the Second Circuits' factors in determining whether a term of pretrial detention qualifies as constitutionally excessive. *Id*. Those factors are "(1) the length of the detention; (2) the extent of the prosecution's responsibility for the delay of the trial; (3) the gravity of the charges; and (4) the strength of the evidence supporting the detention." *Id*. (citing *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000); the remaining citations omitted).

"Other circuits have recognized that the length of pretrial detention raises a constitutional issue at some point." *United States v. Gonzales-Claudio*, 806 F.2d 334, 339 (2d Cir. 1986)(citing cases from the Seventh, Third, and Tenth Circuits); see also *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir. 1986); *United States v. Quartermaine*, 913 F.2d 910, 917-18 (11th Cir. 1990).

In *Nagi, supra*, the Sixth Circuit upheld the district court's findings that no conditions would reasonably assure the defendant's appearance and the safety of the community. (Ex. H - *Nagi*, Pg ID 2). This Court has also made the same findings regarding Nero. However, the Court reversed the district court's decision no to revoke the detention order, and "remanded for the district court to fix a reasonable bail and/or conditions for release of the defendant, pending a future trial." *Id*. at 4.

The defendant in *Nagi* had been in pretrial custody for "three-plus years." *Id*. at 4. The Court found that that factor weighed in favor of the defendant. *Id*. Nero has been in custody for three years and three months.

The Court in *Nagi* also found that the government bore "some responsibility for the more than two-year delay between [the defendant's] arrest and the superseding indictment." *Id*. at 3. Here, the government chose to indict Nero before it had sufficiently reviewed the evidence it had collected, which caused delay in

reviewing the discovery. Technical issues with reviewing the discovery also contributed to delays.

The charges against the *Nagi* defendant were serious, but they did not involve the more serious conspiracy to commit murder charges that some of the co-defendants faced, "some of whom remain free on bond, and none of whom have spent anywhere close to three-plus years in detention." *Id*. at 4. Here, the charges are serious, but they do not involve murder. Nero's alleged acts were a minor part of the overall charges. He was not a leader, and his defense has always been mere presence.

Finally, this Court must consider the evidence of risk of flight and dangerousness. See *El-Hage*, 213 F.3d at 80. The *Nagi* defendant had surrendered his passport, and the Sixth Circuit found that the risks of flight and injury to other persons and the community could be ameliorated by house arrest and an electronic tether, which weighed in favor of release. (Ex. H - *Nagi*, Pg ID 4).

That is the case here. Nero can be monitored just as the defendant in *Nagi*. After remand, the *Nagi* defendant was ordered to meet with Pretrial Services three times a week, avoid contact with the co-defendants, home detention, and many other conditions. (Ex. I - *Nagi* Bond Cond., Case No. 06-20465, Doc. 1006, Pg ID 2618-619). Those same conditions will be sufficient to ensure the safety of the community as well as Nero's return to court.

**II.     Compelling reasons for temporary release**.

This Court may grant the temporary release of Nero:

The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be **necessary for preparation of the person's defense or for another compelling reason**. (Emphasis added.) [18 U.S.C. § 3142(i)(4).]

Nero argues that his recent physical infirmity during the beginning of the COVID-19 pandemic on or about March 2020, his inability to assist in his defense, and the continuations of the trial date because of COVID-19 are compelling reasons for his temporary release.

"[T]he release must be 'temporary,' no longer than needed to complete the 'necessary' defense preparations or to resolve the other 'compelling' circumstances." *United States v. Bothra*, 2020 U.S. App. LEXIS 16383, p. 4 (6th Cir. May 21, 2020)(quoting *U.S. v. Shelton*, 2020 U.S. Dist. LEXIS 62655, 2020 WL 1815941, p. 3 (W.D. Ky. Apr. 9, 2020)(citation omitted)). Nero's release can be made temporary with significant conditions to ensure the community's safety and his return to court with home arrest and electronic tether. For instance, he could be released for the next six months to allow his health to improve as well as allowing him to assist his defense. At the end of that six months, this Court could

review the issue of his detention in light of the ongoing changes in the COVID-19 pandemic.

A defendant's medical condition may present a compelling reason under under § 3142(i). See *United States v. Rebollo-Andino*, 312 Fed. App'x 346, 348 (1st Cir. 2009)(noting the defendant could seek temporary release under § 3142(i) for medical reasons).

Nero's medical condition is serious, making him especially susceptible to COVID-19.

In *United States v. Kennedy*, Case No. 18-20315, 2020 U.S. Dist. LEXIS 56875 (E.D. Mich., Apr. 1, 2020), Judge Judith E. Levy revoked the defendant's detention because the danger of COVID-19 was a compelling reason and release was necessary for Defendant to prepare his pre-sentencing defense. *Id*. at 2–3. The magistrate in *Kennedy* had ordered the defendant detained because of several violations of his pretrial release conditions: "failing several drug screens, failing to report to pretrial services, failing to report to inpatient substance abuse treatment, and failing to report for a bond review hearing." *Id*. at 1–2.

At the United States' request, on March 26, 2020 the Court conducted a bond review hearing and the defendant moved for bond. *Id*. at 2. After the hearing, the

district court temporarily revoked detention pursuant to 18 U.S.C. § 3142(i)(4) for

two reasons:

> [F]irst, because under the facts of this case, the danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody. Second, because temporary release is necessary for Defendant to prepare his pre-sentencing defense. [*Kennedy*, Case No. 18-20315, 2020 U.S. Dist. LEXIS 56875, p. 2–3.]

The district court in *Kennedy* based its decision to release the defendant

based upon the independent statutory ground of 18 U.S.C. § 3142(i)(4). *Kennedy*,

Case No. 18-20315, 2020 U.S. Dist. LEXIS 56875, p. 5. 18 U.S.C. § 3142(i)(4) is

a separate statutory ground, with separate statutory considerations, distinct from

the United States' suggested approach through 18 U.S.C. §§ 3143(a)(1) and

3142(g). See, e.g., *United States v. Thornton*, 787 F.2d 594, 594 (6th Cir. 1986)

(Table decision) (suggesting that a district court could temporarily release a

detainee pursuant to § 3142(i)(4) by subsequent order even after a prior order

holding that the detainee was a flight risk or a risk to public safety pursuant to §

3142(g)).

Although the government in *Kennedy* argued that there were no known cases

of COVID-19 at the jail where the defendant was detained, that the county officials

had instituted precautionary measures, and that that the defendant's symptoms and

underlying conditions did not render him particularly susceptible to COVID-19,

the district court rejected those arguments:

> [The government's argument failed] to address the facts of the current global public health crisis—particularly as Michigan prisons are beginning to see exponential spread of the disease. The seemingly preemptive nature of Defendant's release renders it no less necessary or compelling. To the contrary—as the above background makes clear—waiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release. Such a failure to act could have devastating consequences for Defendant and would create serious medical and security challenges to the existing prison population and the wider community. [*Id*. at 7–9.]

"[C]ourts need not blind themselves to the likelihood of future harm merely

because that harm has not yet occurred. *Id*. at 9 (citing *Flanory v. Bonn*, 604 F.3d

249, 255 (6th Cir. 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct.

2475, 125 L. Ed. 2d 22 (1993) ("We have great difficulty agreeing that prison

authorities may not be deliberately indifferent to an inmate's current health

problems but may ignore a condition of confinement that is sure or very likely to

cause serious illness and needless suffering the next week or month or year . . . a

remedy for unsafe conditions need not await a tragic event.")

The district court in *United States v. Stephens*, 447 F. Supp. 3d 63 (S.D.N.Y.

2020), addressed recent cases considering COVID-19 and temporary release:

> Although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop. See, e.g., Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct.

2007)(noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); see also Claudia Lauer & Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, Associated Press (Mar. 7, 2020). The magnitude of this risk has grown exponentially since the March 6 hearing before this Court; at the end of the day on March 6, New York State had 44 confirmed cases of COVID-19, see Andrew Cuomo (@NYGovCuomo), Twitter (Mar. 6, 2020, 4:51 PM), but by the end of the day on March 18, that number had climbed to 2,382, see *Mitch Smith, et al.*, Tracking Every Coronavirus Case in the U.S.: Full Map, N.Y. Times, Mar. 18, 2020. Though the BOP has admirably put transmission mitigation measures in place, see Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, in the event of an outbreak at the Metropolitan Correctional Center ("MCC") (where the Defendant is currently being detained), substantial medical and security challenges would almost certainly arise. A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis. See, e.g., *United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

[*Stephens*, 447 F. Supp. 3d at 65 (citations to website addresses omitted).]

Courts considering whether temporary pretrial release is "necessary" under § 3142(i) have considered: (1) the time and opportunity the defendant had to prepare for the trial and participate in his defense, (2) the complexity of the case and volume of information, and (3) the expense and inconvenience associated with preparing while incarcerated. *Bothra*, 2020 U.S. App. LEXIS 16383, p. 6 (citations omitted).

Because of COVID-19, Nero's in-person meetings with counsel have been eliminated. There have been technical issues with reviewing the numerous hours of video surveillance footage, and Nero has been at times unable to watch some of the security camera video and pole cam footage. Nero has nervertheless been making notes as well as counsel regarding the 1000's of hours of videos, but the zoom jail hearings do not allow for counsel and Nero to  view the material together which would be more productive.

This case is complex because of the volume of the government's video footage, which needs to be reviewed for exculpatory, corroborating, or impeachment evidence. Preparing for trial while Nero is incarcerated is more expensive and inconvenient.

Nero has always been interested in proceeding to trial and asserting his innocence. The interests of his co-defendants in continuances are not his. An ends-of-justice continuance under 18 U.S.C. § 3161(h)(8), requires a court to find that the ends of justice "outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8) (A). "It does not say that the court may weigh the interests of codefendants." *United States v. Theron*, 782 F.2d 1510, 1513 (10th Cir. 1986).

**III.    Nero's release plan**.

Nero recognizes that he is addicted to drugs and he needs professional support to enable him to return to society. He is therefore not asking that he be released to his home or the home of his father or other relative. In the past, he has been in-patient at SHAR, a residential treatment center[2] located on West Grand Blvd. in Detroit. The organization also provides for transitional housing for up to a year following discharge/release from the treatment facility. The transitional housing program provides services such as continued counseling and training. Mr. Nero left the program several years ago but he has maintained contacts with the organization and has an "open" invitation to return. Nero now has poor health and he is older. The life style that he had been living has one ending; he does not want that. He is now ready  accept treatment seriously.

---

[2] Since 1969, **Self-Help Addiction Rehabilitation**, Inc. (SHAR) has provided high quality behavioral healthcare services to individuals in the Greater Detroit area. Founded in Detroit, Michigan by a priest and two recovering individuals, SHAR has grown and evolved from a small therapeutic community starting at a local parish to a multi-million dollar human service agency. We serve approximately 6,000 individuals annually through our various service centers. SHAR is a federally recognized 501(c)(3), accredited by CARF, licensed by the State of Michigan, and approved by BCBSM and other insurance carriers.

   SHAR's mission has been to assist disadvantaged individuals and to promote lifestyle enhancement. Regardless of whether the challenge the person faced was alcohol or other drug addictions, being a veteran or homeless, battling with mental or physical health issues, struggling women with children, or any number of other issues, SHAR has consistently developed innovative programming and services aimed at alleviating the pain of the disadvantaged individual (Taken from SHAR's web site).

WHEREFORE, Nero moves this Honorable Court to revoke his detention order and grant his temporary release for six months, to be reviewed at that time, with conditions the Court deems appropriate.

Dated: October 5, 2020

Respectfully submitted,

By: /s/*Mark H. Magidson*
    MARK H. MAGIDSON (P25581)
    Attorney for Defendant Nero
    1 Park Ave, Suite 1207
    Detroit, MI 48226
    (313) 963-4311
    mmag100@aol.com

## CERTIFICATE OF SERVICE

I certify that on October 5, 2020, I electronically filed the above *Motion* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

By: /s/*Mark H. Magidson*
    MARK H. MAGIDSON (P25581)
    Attorney for Defendant Nero