UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                  Case No. 17-cr-20183-5

v.

                                  HON. MARK A. GOLDSMITH

D-5 HAROLD LASHAWN NERO,

       Defendant.

_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS (Dkts. 343)

This criminal case involves multiple defendants, all of whom have been charged with involvement in a complex drug- and human-trafficking conspiracy and related crimes at the Victory Inn, a hotel located in Detroit, Michigan. Defendant Harold Lashawn Nero has filed a motion and a supplemental brief seeking suppression of his statements made during an interview conducted during law enforcement's execution of a search warrant. In his motion, Nero contends that he is entitled to suppression because he was under the influence of drugs at the time of the interview, rendering him unable to knowingly, voluntarily, and intelligently waive his Miranda rights. Mot. at 3–4 (Dkt. 343). The Government filed a response (Dkt. 357), and Nero filed a reply (Dkt. 364). Nero subsequently filed a supplemental brief seeking suppression of the same statements on the ground that the search warrant leading to his apprehension lacked probable cause. Suppl. Br. at 2–3 (Dkt. 492). The Government responded to the supplemental brief (Dkt. 553), but Nero did not file a reply.

The Court held an evidentiary hearing regarding Nero's waiver of his <u>Miranda</u> rights on May 27, 2021.[1]  The Court finds that an evidentiary hearing is unnecessary with respect to Nero's challenge of the search warrant, and that oral argument will not aid the decisional process with respect to that issue.  Consequently, the issues raised in Nero's supplemental brief are decided based on the parties' briefing.  <u>See</u> E.D. Mich. LR 7.1(f)(2).  For the reasons that follow, Nero's motion to suppress is denied.

## I. BACKGROUND

As the Court has previously described the factual background of the case in detail in other opinions, it need not do so again for purposes of the present motion.  <u>See, e.g.</u>, 7/15/19 Op. (Dkt. 306) (denying Defendant Ford's motion for bond).  In relevant part, law enforcement obtained a warrant to search the Victory Inn for evidence of a drug and human-trafficking conspiracy.  Victory Inn Warrant (Dkt. 553-2).  The affidavit in support of the warrant identified Nero as a suspect involved in the alleged conspiracy operating at the hotel.  <u>Id.</u> ¶ 9G.  On January 12, 2017, law enforcement executed the warrant and conducted a raid at the Victory Inn, during which officers discovered a loaded firearm, narcotics, drug paraphernalia, and 14 female sex-trafficking victims.  <u>United States v. Nero</u>, No. 17-20183, 2018 WL 10075971, at *2 (E.D. Mich. Apr. 16, 2021).  During the raid, law enforcement officials also encountered and arrested a known source of information (SOI-2), who provided them information regarding Nero's criminal activities at a house located at 7711 Holmes Street in Detroit, Michigan, approximately two miles from the Victory Inn.  <u>See</u> 7711 Holmes Warrant ¶¶ 44–46 (Dkt. 553-3).

---

[1] After the hearing, the Court directed the parties to submit proposed orders setting forth findings of fact and conclusions of law (Dkt. 640).  The Government made its submission on July 7, 2021; Nero made his submission on July 28, 2021 after belatedly seeking an extension.

Based on SOI-2's statements and the evidence discovered at the Victory Inn, law enforcement obtained a warrant to search 7711 Holmes.  See generally id.  On January 12, 2017, law enforcement executed the warrant and seized from 7711 Holmes a shotgun and drug paraphernalia.  Resp. to Suppl. Br. at 6.

 During the search, they also apprehended and conducted a video-recorded interview of Nero.  Before the questioning began, an officer informed Nero of his Miranda rights.  Interview Video I at 00:06–00:36.  Nero stated that he understood his rights and further indicated his willingness to speak with the officers without an attorney present.  Id. at 00:37–00:39, 01:10–01:13.  Additionally, Nero signed a written form containing a statement of his Miranda rights and indicating his waiver of those rights.  See Waiver Form.

Nero now seeks to suppress the statements he made during his interview.  Although Nero agreed to speak with the officers, he contends that his waiver of his Miranda rights was not knowing, voluntary, or intelligent because he was under the influence of crack cocaine.  Mot. at 3.  Additionally, he contends that the search warrant for 7711 Holmes lacked probable cause and was premised on an affidavit that contained false or misleading statements.  Suppl. Br. at 2–3.

The Court held an evidentiary hearing regarding Nero's waiver of his Miranda rights on May 27, 2021.  During the hearing, the Government presented testimony from Task Force Officer Dominic Diggs-Taylor and Special Agent Robert Galbreath, the officers who conducted Nero's interview.  The Government also presented various exhibits, including the video recording of Nero's interview, the waiver form, and Nero's affidavit describing the interview.  Because Nero's four subpoenaed witnesses either chose not to appear or declined to testify, Nero presented no evidence during the May 27 hearing.  See Hr'g Tr. at 74–75, 87–89 (Dkt. 345).

## II. ANALYSIS

### A. Defense Witnesses' Testimony

As an initial matter, the Court confronts an issue concerning the four witnesses Nero subpoenaed to appear at the evidentiary hearing. Before the evidentiary hearing began, the Government contacted the Court and defense counsel raising the concern that allegations made in Nero's affidavit implicated those witnesses in controlled substance crimes. Hr'g Tr. at 7–10 (Dkt. 345). Given the possible nature of the witnesses' testimony, the Government questioned whether independent counsel should advise those witnesses of their constitutional rights before they testified. Id. Court staff contacted the federal defender's office (FDO), which secured independent counsel for the four subpoenaed witnesses. Id. at 9.

According to Nero's defense counsel, only two of the subpoenaed witnesses appeared at the courthouse for the evidentiary hearing. Id. at 7–8. The two witnesses who appeared—Kelly Spoor and Mark Swoveland—were able to confer with independent counsel provided through the FDO. Id. at 8, 74–75, 87–89. After speaking with independent counsel, Spoor and Swoveland exercised the Fifth Amendment right against self-incrimination and declined to testify. Id. at 74–75, 87–89.

Because these witnesses chose not to testify, Nero's counsel suggested that he instead be permitted to proffer his own declaration setting forth Spoor's and Swoveland's expected testimony. Id. at 111. The Court afforded the parties an opportunity to file supplemental briefing addressing the legal viability of this suggestion. Id. at 111–116. Following the hearing, Nero filed a supplemental brief requesting that the Court grant Spoor and Swoveland immunity for purposes of testifying. Nero Post-Hr'g Suppl. Br. at 4 (Dkt. 633). The Government filed a response in opposition. Gov't Post-Hr'g Suppl. Br. (Dkt. 635).

4

In his supplemental filing, Nero also described the witnesses' expected testimony.  With respect to Spoor, Nero anticipated that she would testify that she rented the house at 7711 Holmes, has known Nero for ten years, and is aware that Nero is addicted to heroin and cocaine.  Nero Post-Hr'g Suppl. Br. at 2–3.  Nero also expected Spoor to testify that she had been smoking crack cocaine with him for several hours before the search of 7711 Holmes took place and that Nero had been on a smoking binge for two days before the interview.  Id. at 3.

With respect to Swoveland, Nero predicted that he would testify regarding the typical side effects of crack cocaine.  Id.  Swoveland, who was present during the search of 7711 Holmes, was also expected to testify that 20 to 30 officers carrying assault rifles and wearing tactical gear—including helmets and masks—arrived at the residence in an armored vehicle.  Id.

Even assuming that Nero's description is an accurate reflection of how these witnesses would have testified, the Court would not have found such testimony credible.  As detailed below, it is abundantly evident from the video of the interview that Nero was competent to waive his Miranda rights and that law enforcement did not coerce him into waiving those rights.  Accordingly, the Court need not resolve whether the proffered statements are properly considered or whether the witnesses should be granted immunity.

### B.  Waiver of Miranda Rights

In his motion, Nero contends that his statements made during the interview must be suppressed because he was under the influence of crack cocaine, rendering him unable to voluntarily, knowingly, and intelligently waive his Miranda rights.  Mot. at 4–9.  First, the Government responds that the protections of Miranda do not apply because Nero was detained rather than "in custody."  Resp. at 8–9 (Dkt. 364).  Second, the Government argues that even if Nero was in custody, the evidence demonstrates that he was competent to waive his Miranda rights.  Id. at 12–16.  The Court confronts each of the Government's arguments in turn.

5

### 1.  Application of <u>Miranda</u>

Under the Fifth Amendment, a defendant cannot be "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "In <u>Miranda</u>, the Supreme Court determined that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination."  <u>United States v. Malcolm</u>, 435 F. App'x 417, 420 (6th Cir. 2011) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 478–479 (1966)).  "To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to <u>Miranda</u> warnings cannot be admitted at trial."  <u>Id.</u> (citing <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994)).  For <u>Miranda</u> rights to apply, however, "the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest."  <u>United States v. Fein</u>, 843 F. App'x 765, 771 (6th Cir. 2021) (punctuation modified).

It is well established that "during the execution of a search warrant for contraband, police officers have the 'limited authority to detain the occupants of the premises while a proper search is conducted.'"  <u>United States v. Binford</u>, 818 F.3d 261, 269 (6th Cir. 2016) (quoting <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981)).  Such a detention does not constitute an arrest as long as the questioning does not prolong the search.  <u>Id.</u> (citing <u>Muehler v. Mena</u>, 544 U.S. 93, 99–101 (2005)).  Here, there is no dispute that Nero was not formally taken into custody at the time of his interview, as officers questioned him incident to a search warrant.

But this does not end the inquiry, as the Court must assess whether the restraints on Nero's freedom nevertheless rose to the level of an arrest.  To make this determination, courts must objectively consider the totality of the circumstances in determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action."  <u>Id.</u> (punctuation modified).  "The first factor considered is whether a reasonable person in defendant's situation would have believed that [he] was free to terminate the interrogation and

6

leave." <u>Malcolm</u>, 435 F. App'x at 420–421 (punctuation modified).  Courts also consider the following factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." <u>United States v. Luck</u>, 852 F.3d 615, 621 (6th Cir. 2017).

By way of example, the Sixth Circuit determined in <u>Luck</u> that a defendant was not in custody where he was interviewed in his family home for roughly one hour, in two 20- to 30-minute sessions—a duration the Sixth Circuit deemed "not lengthy by our standards." <u>Id.</u>  During the interview, officers spoke to the defendant in a calm, conversational manner and did not brandish their weapons.  <u>Id.</u>  The defendant's freedom of movement was not significantly restricted, as the officers kept the door to the room open and did not block the exit.  <u>Id.</u>  Although the officers did not inform the defendant that he was free to leave, they did inform him that he was not required to speak with them.  <u>Id.</u>  And although the defendant had severe learning disabilities and was under the influence of sleeping medication from the night before, those facts were found to be irrelevant under the objective custody inquiry.  <u>Id.</u>

As another example, in <u>Binford</u>, the Sixth Circuit determined that suppression of statements made during an interview was unnecessary because the defendant was permissibly detained incident to a search warrant, and was not unlawfully arrested without probable cause. 818 F.3d at 270.  In that case, 15 officers wearing tactical uniforms and carrying rifles forced entry into the defendant's apartment to execute a search warrant.  <u>Id.</u> at 265.  One of the officers took the defendant—who was handcuffed and clothed in only a bedsheet—into a bathroom within the apartment to conduct an interview.  <u>Id.</u>  The officer read the defendant his <u>Miranda</u> rights, and the defendant signed a form waiving those rights.  <u>Id.</u>  In total, the interview lasted 15 to 20 minutes.

Id. at 266.  Although the officer acknowledged that the defendant was not free to leave during the search, the Sixth Circuit determined that he was not under arrest.  Id. at 266, 270.

Here, the totality of the circumstances demonstrates that Nero was detained rather than in custody.  Nero was questioned at 7711 Holmes, which he considered "a second home" and the "main place" where he spent the night at the time of the search.  Undated Nero Aff. ¶ 6 (Dkt. 492-1); 9/11/19 Nero Aff. ¶ 14 (Dkt. 343).  Diggs-Taylor testified that Nero was moved to a private location within the home, to ensure his safety and that his statements would not be overheard by other suspects who may have been motivated to retaliate.  Hr'g Tr. at 28.  Where, as here, the interrogation takes place in a place that the defendant considers to be his home, this factor weighs against a finding that the defendant was in custody, as "individuals are more comfortable speaking up and asserting themselves in the familiar confines of their home."  See Luck, 852 F.3d at 621.

Further, the interview was conducted in a non-threatening manner.  Diggs-Taylor admitted that approximately 10 to 15 officers—who may have been wearing tactical gear and carrying assault rifles—forcefully entered the house and yelled for the occupants to get down on the ground.  Hr'g Tr. at 43–46.  By the time the interview began, however, the other officers had completed the protective sweep and were conducting a "calm" search of the residence.  Id. at 68–69.  Consistent with Diggs-Taylor's testimony, there is no background noise detectable in the video of the interview.  The interview was conducted by Diggs-Taylor and Galbreath, both of whom testified that they were wearing plainclothes and that they kept their guns holstered.  Id. at 23, 27, 80, 82.  Neither officer placed Nero under arrest or threatened arrest before or during the interview.  Id. at 26–27, 82.   The video demonstrates that the interview lasted only 38 minutes and that the officers spoke to Nero in calm, conversational tones—as illustrated when one of the officers reassured Nero that he did not intend to cause offense by inquiring about Nero's personal drug use.  See

Interview Video I at 02:48–02:53.  Diggs-Taylor and Galbreath stated that during the interview, they were sitting down approximately four to six feet away from Nero.  Hr'g Tr. at 34, 89.

With respect to the restraint on Nero's movement, an officer zip-tied Nero's hands in front of him for the safety of the other officers on the scene.  Id. at 25, 49, 81–82.  But the mere fact that Nero was restrained with zip ties does not render his detention an arrest.  See, e.g., United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007) (holding that handcuffing as a safety precaution "is appropriate even where police are merely detaining, but not arresting, a suspect").  The restraints on Nero—which were no greater than those used in Binford—did not render his detention custodial.  See Binford, 818 F.3d at 265-66, 270.

Although Diggs-Taylor acknowledged that Nero was not free to leave, he informed Nero of his right to remain silent.  Hr'g Tr. at 30–31, 53; Interview Video I at 00:06–00:36.  When asked whether he understood his rights, Nero nodded affirmatively and said yes.  Interview Video I at 00:37–00:39.  Additionally, Nero signed a written form that set forth his Miranda rights, including the right to remain silent.  Id. at 00:39–01:05.  Like Nero, the defendant in Binford was found to be detained rather than in custody even though he was not free to leave during the search but was informed of his right to remain silent.  See 818 F.3d 265–266.  Further, whether a reasonable person in the suspect's position would have felt free to leave is only one element that courts consider and "is not necessarily an ultimate or even dispositive inquiry . . . ."  United States v. Salvo, 133 F.3d 943, 950 (6th Cir. 1998).

Finally, because the custody inquiry is an objective one, whether Nero was under the influence of drugs is immaterial to the analysis.  See Luck, 852 F.3d at 621–622 (rejecting the defendant's argument "that he was a 21-year-old kid who never lived outside of his parents' home, who had severe learning disabilities, and who was coming off sleeping medications from the night before" because those factors were irrelevant under the objective custody inquiry) (punctuation

modified); see also Yarborough v. Alvarado, 541 U.S. 652, 667–669 (2004) (holding that a suspect's "actual mindset" is irrelevant because the custody inquiry is an objective one).

The Court concludes that the totality of the circumstances weighs in favor of a finding that Nero was detained during his interview and was not in custody. Although Nero was restrained and was not free to leave, those measures were implemented to protect the officers performing the search. Further, the officers informed Nero of his right to remain silent. The interview itself was brief, took place in a home with which Nero was familiar, and was conducted in a calm, non-threatening manner. Consequently, because Miranda protections do not apply to the statements made during the interview, suppression is not warranted.

### 2. Effectiveness of Miranda Waiver

Even assuming that Nero was in custody at the time of his interview such that he would be entitled to the protections of Miranda, the evidence demonstrates that he waived those rights. "To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and intelligently' made." United States v. Montgomery, 621 F.3d 568, 573 (6th Cir. 2010) (quoting Miranda, 384 U.S. at 444). "The inquiry as to whether there was a valid waiver has two components." United States v. Wilkerson, 76 F. App'x 657, 660 (6th Cir. 2003). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. "The ultimate question is 'whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Holland v. Rivard, 9 F. Supp. 3d 773, 787 (E.D. Mich. 2014), aff'd, 800 F.3d 224 (6th Cir. 2015) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985)). "The government bears the

burden of proving, by a preponderance of the evidence, that <u>Miranda</u> rights were voluntarily and knowingly waived." <u>Binford</u>, 818 F.3d at 273.

### a. Voluntary Waiver

"The test for whether a <u>Miranda</u> waiver is voluntary is essentially the same as the test for whether a confession is voluntary." <u>Id.</u> at 271 (punctuation modified). In determining whether a confession is involuntary, courts consider whether: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." <u>Id.</u> (punctuation modified).

Nero maintains that his waiver of his <u>Miranda</u> rights was involuntary for two reasons. First, he claims that he lacked the capacity to voluntarily waive his rights because he was paranoid and delusional after two days of using cocaine. 9/11/19 Nero Aff. ¶¶ 15, 17–18; Mot. at 7–8. Second, he contends that officers coerced him into waiving his rights by telling him that if he cooperated by giving a statement, the Government would "look favorably toward him regarding whether to charge him." Mot. at 3.

Even if a defendant's "cognitive or volitional capacity was impaired, that is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." <u>Luck</u>, 852 F.3d at 623 (punctuation modified). But "when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." <u>United States v. Haddon</u>, 927 F.2d 942, 946 (7th Cir. 1991).

Here, the evidence demonstrates that Nero's volitional capacity was unimpaired and that the officers had no reason to suspect that Nero was under the influence of drugs. Although Diggs-

Taylor did not ask Nero whether he had recently used drugs, Hr'g Tr. at 53, Nero did not exhibit any behavior suggesting that he was under the influence, id. at 35–36, 90.  Nor did Nero inform Diggs-Taylor or Galbreath that he was high.  Id. at 36, 90.  The video of the interview is consistent with the officers' descriptions, as Nero did not exhibit any unusual behavior and appropriately responded to questions.  Nero was calm, coherent, and lucid, and he exhibited recall for details such as names of individuals who frequented the Victory Inn, the room numbers they occupied, and the type of vehicle driven by one of those people.  See, e.g., Interview Video I at 04:14–04:31 04:41–04:43, 08:30–08:35, 09:50–10:03, 10:35–10:40.  Additionally, Nero exhibited discernment by requesting that he be permitted to make certain statements off-camera, id. at 12:10–12:15, and by admitting that he "had a feeling" that law enforcement was going to search 7711 Holmes because he saw coverage of the Victory Inn raid on the news, id. at 09:31–09:40.

The Court finds this evidence to be more credible than Nero's self-serving statements that he was delusional and unable to think clearly and that he informed the officers that he was high from smoking all night.  See 9/11/19 Nero Aff. ¶¶ 15–18.  In support of his claim that he was incapacitated, Nero contends that officers had him provide a urine sample to verify whether he was under the influence of cocaine.  Id. ¶ 22.  However, this allegation was made for the first time in his affidavit—executed over two and a half years after his interview—and is unsupported by any objective evidence such as lab results.[2]  Moreover, Diggs-Taylor and Galbreath both denied that Nero was asked to provide a urine sample.  Hr'g Tr. at 40, 105.  Additionally, Nero maintains that he was incapacitated, as demonstrated by the fact that his signature on the waiver form executed on January 12, 2017, was "sloppier" than his signature on a waiver form executed on

---

[2] Since the Court granted Nero's motion to compel with respect to disclosure of any results of drug tests, he would presumably have access to these results.  See 7/31/19 Op. & Order at 10–11 (Dkt. 307).

January 13, 2017.  See Hr'g Tr. at 60.  The Court is not persuaded that Nero's handwriting is probative of his mental state—particularly where his signature on the January 12, 2017 waiver form is no less legible than his signature on his affidavit executed during his incarceration in 2019. Compare Waiver Form with 9/11/19 Nero Aff.; Hr'g Tr. at 66.  Accordingly, the evidence demonstrates that Nero had the capacity to voluntarily waive his Miranda rights.

Nor does the evidence show that the officers coerced Nero's cooperation by making threats or by promising him leniency in prosecution.  As discussed above, Diggs-Taylor and Galbreath interviewed Nero in a calm, non-threatening manner.  And during the evidentiary hearing, both officers repeatedly denied making any threats or promises to Nero or observing any other officer do so.  Hr'g Tr. at 37, 71, 91–92, 107.  During the interview, Diggs-Taylor and Galbreath said to Nero that they were giving him the "opportunity" to say whatever he wanted.  Interview Video II at 18:45–18:57.  On cross-examination, the officers denied that it would be logical to infer from their statements that Nero was being offered the opportunity to "cut a deal," as opposed to merely the opportunity to speak.  Hr'g Tr. at 63–64, 107.  The Court agrees.  Moreover, the Court notes that Nero's affidavit is devoid of any allegation that officers promised him anything in exchange for his interview; rather, he stated that his delusional thinking caused him to believe that if he "just 'explained' to them what was going on, they would let [him] go."  9/11/19 Nero Aff. ¶ 18.

In light of this evidence, the Court concludes that the Government has established by a preponderance of the evidence that Nero's waiver of his Miranda rights was voluntary.

### b.  Knowing and Intelligent Waiver

"To determine whether the confession was knowing and intelligent, [courts] apply a totality of the circumstances test to ascertain whether [the defendant] understood his right to remain silent and to await counsel."  Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005).  These circumstances include the defendant's "age, experience, education, background, and intelligence."  Garner v.

Mitchell, 557 F.3d 257, 261 (6th Cir. 2009).  "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  Rather, he need only understand that he can choose not to talk to the police, to talk only with counsel present, or to stop talking at any time.  Id.

The evidence in the present case demonstrates that Nero understood his rights.  Before any questioning began, Diggs-Taylor said to Nero, "Just listen, okay?  If you have any questions, just ask me."  Interview Video I at 00:01–00:06.  Diggs-Taylor proceeded to inform Nero of his Miranda rights, including his right to remain silent and to consult with an attorney.  Id. at 00:06–00:36.  When asked whether he understood those rights, Nero nodded affirmatively and said yes.  Id. at 00:37–00:39.  Nero also signed a written form containing a statement of his Miranda rights and indicating his waiver of those rights.  Id. at 00:39–01:05; see also Waiver Form.  After Nero signed the waiver form, Diggs-Taylor asked him again, "Do you want to talk to us?  Do you mind answering some questions?"  Interview Video I at 01:06–01:10.  Nero responded that he did not care and had nothing to hide.  Id. at 01:10–01:12.  Diggs-Taylor confirmed, "So, that is a yes?" and Nero affirmatively nodded and responded, "Yeah."  Id. at 01:12–01:13.  Accordingly, Nero conveyed his understanding of his rights and waived those rights—orally and in writing—no fewer than three times.  And at no point during the interview did Nero request counsel or seek to end the questioning.

As discussed above, Nero's demeanor and behavior during the interview contradicts his assertions that he lacked the capacity to understand that he was not required to speak with law enforcement.  Nero was calm, coherent, and lucid; he recalled details regarding criminal activities at the Victory Inn; and he exercised judgment in requesting to make certain statements off-camera.  Moreover, Nero was no novice.  He was over 40 years old at the time of the interview, and he had

an extensive criminal record with at least 10 convictions dating back to 1995.  See 12/11/20 Op. & Order at 12 (Dkt. 542).  The Court rejects Nero's argument that the influence of drugs prevented him from understanding that he was waiving his rights to remain silent and to await counsel.

The Court concludes that the Government has established by a preponderance of the evidence that Nero's waiver of his Miranda rights was knowing and intelligent.  Suppression of his statements is, therefore, not warranted.

### B. Search Warrant

Nero also seeks suppression of his interview statements by challenging the warrant to search 7711 Holmes.  First, he argues that the warrant lacked probable cause on its face because the supporting affidavit primarily concerned the Victory Inn rather than 7711 Holmes and was premised on statements made by an informant of unknown reliability.  Suppl. Br. at 5–7.  Second, maintaining that the affidavit contained misleading statements, Nero seeks a Franks evidentiary hearing to test the validity of the affidavit.  Id. at 7–8.[3]  The Government opposes Nero's motion, arguing that the warrant was supported by probable cause and that a Franks hearing is unnecessary.  Resp. to Suppl. Br. at 1–2.  And even if the search of 7711 Holmes was unconstitutional, the Government maintains that suppression of Nero's statements is not required under the good-faith exception to the rule of exclusion.  Id. at 15–19.

In resolving these issues, the Court first addresses whether the warrant, on its face, was supported by probable cause.  Determining that it was, the Court next confronts whether Nero is entitled to a Franks hearing regarding the validity of the statements made in the affidavit.  Finally, the Court evaluates whether the good-faith exception to the rule of exclusion would apply if the search was unconstitutional.

---

[3] A Franks hearing is named in reference to Franks v. Delaware, 438 U.S. 154 (1978).

### 1. Probable Cause

The Fourth Amendment protects against "unreasonable searches and seizures" by requiring that warrants be based on "probable cause" and "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Williams, 544 F.3d 683, 686 (6th Cir. 2008) (punctuation modified).  To determine whether an affidavit in support of a search warrant establishes probable cause, an issuing magistrate must "make a practical, common-sense decision," based on "all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information . . . ." Illinois v. Gates, 462 U.S. 213, 238 (1983) (punctuation modified).  Additionally, the affidavit must demonstrate "a nexus between the place to be searched and the evidence sought." United States v. Laughton, 409 F.3d 744, 747–748 (6th Cir. 2005) (punctuation modified).

In reviewing the magistrate's probable-cause determination, this Court's task is to ensure that the magistrate had a "substantial basis" for his conclusion. Gates, 462 U.S. at 238–239.  To encourage the use of and reliance on judicially approved warrants in the course of law enforcement investigations, "reviewing courts are to accord the magistrate's determination great deference," and a probable-cause determination "should only be reversed if it was arbitrarily exercised." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (punctuation modified).  The Court's review for sufficiency of evidence is limited to the information contained within the four corners of the affidavit. United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006).

The search warrant for 7711 Holmes was supported by an affidavit supplied by Special Agent Stephen Weber, based on his personal involvement in the investigation of the Victory Inn. Many of the allegations in the affidavit concern the Victory Inn, outlining evidence of an extensive

drug- and human-trafficking conspiracy and identifying Nero as one of the members of the conspiracy.  7711 Holmes Warrant ¶¶ 3–4, 9–43.  The affidavit states that law enforcement received information from multiple informants—including suspected sex-trafficking victims—confirming that the conspiracy operated from the Victory Inn.  Id. ¶¶ 9–15.  During surveillance of the hotel, law enforcement observed suspicious activity (such as hand-to-hand deals) and conducted traffic stops resulting in the discovery of drugs and evidence of prostitution.  Id. ¶ 25–29.  Upon executing the search warrant at the Victory Inn, law enforcement discovered drugs, at least one firearm, and several victims of sex trafficking.  Id. ¶ 43.

The affidavit further states that law enforcement encountered SOI-2 during the Victory Inn raid.  Id. ¶ 44.  During the officers' surveillance activities at the hotel, SOI-2 had been observed frequently travelling between the Victory Inn and 7711 Holmes.  Id.  SOI-2 confirmed that he had been to 7711 Holmes many times and that, within the past 24 hours, he had personally observed: (i) Nero at 7711 Holmes in possession of packets of heroin and cocaine, (ii) one or more human-trafficking victims present at the premises, and (iii) Nero state that he was in possession of a "spreader" firearm that he transported from the Victory Inn to the basement of the premises.  Id. ¶¶ 44–46.  The search of 7711 Holmes uncovered a shotgun and drug contraband but no distribution-level quantities of drugs, no human-trafficking victims, and no spreader.  Suppl. Br. at 2; Resp. to Suppl. Br. at 6.

Nero contends that the affidavit failed to supply probable cause to search 7711 Holmes when only three of the numbered paragraphs concern activities that allegedly took place at that address and the remainder of the affidavit concerns the Victory Inn.  Suppl. Br. at 5–6.  But SOI-2's statements included in the affidavit created a nexus between 7711 Holmes and the criminal activity that took place at the Victory Inn.  SOI-2 stated that he had personally observed drugs and human-trafficking victims at 7711 Holmes within the past 24 hours, and that Nero claimed that he

17

had transported a firearm from the Victory Inn to the premises.  Further, the allegations regarding the Victory Inn provide relevant context increasing the probability that evidence of a crime would be discovered at 7711 Holmes.  That is, the fact that law enforcement discovered tangible evidence of a drug and human trafficking conspiracy at the Victory Inn rendered it more likely that Nero— an alleged member of the conspiracy—would carry on similar activities at 7711 Holmes. Accordingly, the search warrant for 7711 Holmes was supported by probable cause.

Nero maintains that probable cause cannot exist where there is no indication that SOI-2 was a reliable source and where law enforcement made no effort to corroborate SOI-2's statements. Suppl. Br. at 5–6.  The Sixth Circuit has held that "an affidavit including a tip from an informant that has been proven to be reliable may support a finding of probable cause in the absence of any corroboration."  United States v. Woosley, 361 F.3d 924, 926–927 (6th Cir. 2004).  But "in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration."  United States v. Jackson, 470 F.3d 299, 307 (6th Cir. 2006) (punctuation modified).

Contrary to Nero's argument, the affidavit indicates that SOI-2 was a reliable source.  The affidavit indicates that officers observed SOI-2 travel between 7711 Holmes and the Victory Inn over the course of three weeks, consistent with SOI-2's representation that he had been to 7711 Holmes on many occasions.  7711 Holmes Warrant ¶ 44.  The affidavit further stated that "SOI-2 provided independent and accurate information, which law enforcement was able to corroborate, about the activities of multiple suspects . . . ."  Id.  Given SOI-2's demonstrated reliability, his statements support a finding of probable cause.

SOI-2's reliability is further bolstered because his identity was known to law enforcement and because his statements were made based on his firsthand observation of events.  Statements made by an informant whose identity is known to the police and who would be subject to

18

prosecution for making a false report are entitled to greater weight than statements made by an anonymous source. United States v. May, 399 F.3d 817, 824–825 (6th Cir. 2005). Additionally, statements made by eyewitnesses are "generally entitled to a presumption of reliability and veracity" where they are reasonably trustworthy. See Wesley v. Campbell, 779 F.3d 421, 429 (6th Cir. 2015) (punctuation modified); Allen, 211 F.3d at 976 (finding that corroboration was not necessary where the informant was not anonymous, had worked with police for over five years, and directly observed the criminal activity). Moreover, the details provided in SOI-2's description of events—including the type of drugs, the type of firearm, and the firearm's location—lend the tip additional credibility. See Jackson, 470 F.3d at 307–308 ("[T]here could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand . . . .") (punctuation modified).

Nero raises three additional challenges to the search warrant that may be dispensed with summarily. First, Nero argues that probable cause did not exist because no human-trafficking victims, no spreader (a type of firearm), and no distribution-quantity drugs were discovered during the search. Suppl. Br. at 2, 6–7. But probable cause is not premised on whether a search ultimately leads to the discovery of evidence; rather, it requires a forward-looking evaluation of whether there is a fair probability that evidence will be discovered. See Florida v. Harris, 568 U.S. 237, 249 (2013) ("[W]e do not evaluate probable cause in hindsight, based on what a search does or does not turn up.").

Second, Nero contends that SOI-2's allegation that he possessed multiple packets of drugs showed only that he is an addict who possessed drugs for personal use and not for distribution. Suppl. Br. at 6. But an intent to distribute may reasonably be inferred where drugs are individually wrapped rather than grouped in one bag. See United States v. Leary, 422 F. App'x 502, 509 (6th Cir. 2011). Although Nero's possession of drugs could be consistent with personal use, "when

19

facially innocent actions taken together create bona fide suspicions, probable cause may arise."
See United States v. Respress, 9 F.3d 483, 487–488 (6th Cir. 1993).  Viewed in the context of the
evidence of drug trafficking uncovered at the Victory Inn, Nero's alleged possession of drugs at
7711 Holmes could reasonably support a finding of probable cause.

Third, Nero criticizes the fact that the affidavit omits certain details, such as descriptions
of the alleged human-trafficking victims and the spreader firearm.  Suppl. Br. at 7–8.  The Sixth
Circuit, however, has admonished courts to avoid "read[ing] the affidavit as a critic would,
focusing on what is missing as opposed to asking whether what is there is enough to supply some
minimal connection between the illegal activity and the place to be searched."  United States v.
White, 874 F.3d 490, 502 (6th Cir. 2017).  Here, as explained above, the search warrant was
supported by probable cause even in the absence of this additional information.

The Court, therefore, concludes that the magistrate judge had a substantial basis for
determining that the search warrant for 7711 Holmes was supported by probable cause.

### 2. **Franks** Hearing

Nero next argues that Weber's affidavit contained misleading statements and material
omissions.  Suppl. Br. at 7–8.  Nero contends that Weber recklessly relied on SOI-2's false
statements without independently verifying the information and that he omitted material details
such as descriptions of the alleged victims or the spreader.  Id. at 7–8.  Accordingly, Nero maintains
that he is entitled to a Franks hearing to test the validity of the affidavit.  Id. at 8–10.  The
Government contends that Nero is unable to make the requisite showing that would entitle him to
a Franks hearing.  Resp. to Suppl. Br. at 19.

 A defendant who challenges the veracity of an affidavit bears a heavy burden and must
make more than conclusory allegations.  United States v. Bennett, 905 F.2d 931, 934 (6th Cir.
1990).  "A defendant is entitled to a Franks hearing if he: 1) makes a substantial preliminary

showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." United States v. Young, 847 F.3d 328, 348–349 (6th Cir. 2017).

Nero is unable to make a substantial showing that Weber recklessly included false statements or made material omissions in the affidavit. The only evidence Nero supplies in support of his argument is his affidavit, in which he attacks the veracity of SOI-2's statements regarding Nero's possession of drugs and a spreader and the presence of human-trafficking victims. Undated Nero Aff. ¶¶ 3-5. But Nero does not claim in the affidavit that Weber's statements were false—only that SOI-2's statements were false. The Sixth Circuit has rejected this tactic and held that the "intentionally or recklessly false statement must be made by the affiant herself, not the non-governmental informant." United States v. Rodriguez-Suazo, 346 F.3d 637, 648 (6th Cir. 2003); see also United States v. Hudson, 325 F. App'x 423, 426 (6th Cir. 2009). Even if the informant's report is inaccurate, courts "tolerate such a result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made." Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir. 1998). Nero has not shown that Weber had reason to disbelieve SOI-2's information. To the contrary, the representations would have appeared credible in light of the evidence discovered at the Victory Inn.

With respect to Nero's argument that Weber recklessly relied on SOI-2's statements without independently corroborating the information, the Court determined above that SOI-2 was shown to be a sufficiently reliable source. Given that SOI-2 provided accurate information about several of Nero's codefendants, Weber did not act recklessly in relying on his statements regarding Nero. "Where a police officer has received a detailed tip from a reliable informant, his failure to

21

further corroborate that tip does not constitute recklessness" entitling the defendant to a <u>Franks</u> hearing.  <u>United States v. Johnson</u>, 580 F.3d 666, 671 (7th Cir. 2009).

Finally, Nero contends that the affidavit was misleading because it contained material omissions, including descriptions of the alleged human-trafficking victims and a description of the spreader.  Suppl. Br. at 7–8.  There is a higher bar for obtaining a <u>Franks</u> hearing on the basis of an alleged omission as compared to an allegedly false affirmative statement.  <u>United States v. Fowler</u>, 535 F.3d 408, 415 (6th Cir. 2008).  That is because of the "potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit."  <u>Id.</u> at 415–416 (punctuation modified).  Here, Nero fails to demonstrate how Weber's omission of descriptions of the alleged victims and of the spreader misled the magistrate.  Nor does he explain how inclusion of these details would have impacted the probable cause determination.  In the Court's view, the inclusion of physical descriptions of the alleged victims and a description of the spreader would only bolster, and not eliminate, probable cause.

The Court, therefore, concludes that Nero is not entitled to a <u>Franks</u> hearing.

### 3. Good-Faith Exception

Even assuming that the search of 7711 Holmes was unconstitutional, suppression of Nero's statements made during the interview would not be necessary.  Although the judicially developed exclusionary rule generally prevents the Government from using evidence obtained in violation of the Fourth Amendment against a victim of an unlawful search, a magistrate's error in issuing a search warrant does not necessarily require suppression of evidence.  <u>United States v. McCoy</u>, 905 F.3d 409, 415 (6th Cir. 2018).  In <u>United States v. Leon</u>, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  468 U.S. 897, 905 (1984).

To determine whether the good-faith exception applies, a court must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n.23.  The Supreme Court has identified four situations in which an officer's reliance would not be objectively reasonable: (i) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit" that violated Franks; (ii) "where the issuing magistrate wholly abandoned his judicial role"; (iii) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (iv) when a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Id. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610–611 (1975) (Powell, J., concurring)); United States v. Abernathy, 843 F.3d 243, 257 (6th Cir. 2016).

Nero maintains that the good-faith exception to the exclusionary rule is inapplicable under the third scenario described above—where an affidavit is so lacking in indicia of probable cause that reliance on it is unreasonable.  Suppl. Br. at 15.  In support of this position, Nero reiterates his argument that the warrant lacked probable cause because the bulk of the allegations in the affidavit concerned criminal activities at the Victory Inn.  Id. at 16.

Showing good-faith reliance is a less demanding standard than proving the existence of probable cause.  United States v. Carpenter, 360 F.3d 591, 595 (6th Cir. 2004).  Good-faith reliance requires "a minimally sufficient nexus between the illegal activity and the place to be searched," and exists "even if the information provided was not enough to establish probable cause."  Id. at 596.  A bare bones affidavit "that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge" is insufficient to sustain good-faith reliance.  White, 874 F.3d at 496 (punctuation modified). However, "[i]f the reviewing court is able to identify in the averring officer's affidavit some

23

connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable." Id. (punctuation modified).

As described above, the affidavit sets forth facts establishing a direct link between criminal activity and 7711 Holmes. SOI-2 stated that he observed Nero in possession of drugs at 7711 Holmes, that human-trafficking victims were present at the premises, and that Nero stated he brought a spreader to the premises from the Victory Inn. Accordingly, reasonable officers would have believed that the affidavit submitted was sufficient to support the issuance of the search warrant.

Nero also claims that the good-faith exception does not apply because the affidavit contained misleading information. Suppl. Br. at 16–17. For the reasons set forth above in connection with Nero's request for a Franks hearing, the Court rejects the position that the affidavit was misleading. Therefore, even if the search warrant for 7711 Holmes was not supported by probable cause, exclusion of Nero's statements is not warranted under the good-faith exception to the exclusionary rule.

### III. CONCLUSION

For the reasons discussed above, the Court denies Nero's motion to suppress (Dkt. 343, 492).

SO ORDERED.

Dated: August 5, 2021                   s/ Mark A. Goldsmith
      Detroit, Michigan                    MARK A. GOLDSMITH
                                   United States District Judge